## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SCOTT GURTEN** | : | **CIVIL ACTION** |
| | : | |
| **vs.** | : | **NO. 17-1841** |
| | : | |
| **JEFFERSON SESSIONS,** *et al.* | : | |

**KEARNEY, J.**                                                                    **January 3, 2018**

## MEMORANDUM
### with Findings of Fact and Conclusions of Law

After evaluating credibility of conflicting trial testimony, we today address a citizen's Second Amendment right to possess a gun after he pleaded guilty to possessing an unlicensed handgun, possessing the same unlicensed handgun in public in Philadelphia, and simple assault in connection with a November 7, 2005 physical assault of his girlfriend concerning temporary custody of their two children. The evidence adduced during our non-jury trial confirms the citizen engaged in violence including at least hitting her during the assault. The legal issue is whether Congress' prohibition on firearms for those committing serious crimes is unconstitutional as applied to the citizen's convictions for crimes punishable by more than two years in prison as recently guided by our court of appeals in *Binderup v. Attorney General United States of America*.[1] Requiring fact-finding and then working through the conflicting trial evidence of the November 7, 2005 assault after applying the shifting burdens of proof, we find the 2005 convictions are for "serious crimes" which traditionally bar the right to keep and bear arms. Even if he had met his burden of distinguishing his crimes from "serious crimes", the United States satisfies our intermediate scrutiny of the prohibition as applied. We enter judgment following trial against the citizen seeking a gun.

I.    **Findings of Fact**

1.    In the late 1990s, Philadelphian Scott Gurten purchased a handgun with a license to carry.

2.    His handgun carry license expired before November 7, 2005.

3.    When not holstered on his body, Mr. Gurten kept his handgun with him in his pick-up truck or in a lock box or secure safe in his home which he shared with his longtime girlfriend Tracy Scarlota and their two children, aged nine and four years old.

4.    Following recurring domestic troubles, Ms. Scarlota would leave Mr. Gurten's home from time to time to stay with her parents.

5.    Ms. Scarlota described Mr. Gurten as abusive although she swore not knowing of his handgun until November 7, 2005 when he allegedly used it against her.

6.    Mr. Gurten described Ms. Scarlota as suffering from addiction to heroin, prescription drugs and alcohol in the mid-2000s.   He described his efforts, along with her family (whom he viewed as a second family), to intervene with rehabilitation.

7.    Sometime shortly after Halloween night 2005, Ms. Scarlota left their home with their children.

8.    Ms. Scarlota drove away in a car owned by Mr. Gurten.

9.    Mr. Gurten believed Ms. Scarlota and the children again went to Ms. Scarlota's parents' nearby home for several days.

10. Ms. Scarlota testified she went to her parents' home.

11. After a few days, Ms. Scarlota's late father, Frank Scarlota, told Mr. Gurten the children were not living with them.

12. Mr. Gurten did not know where to find his children.  He expressed concern for

their safety fearing Ms. Scarlota's abuse of heroin, prescription pills, and alcohol.

***Events of November 7, 2005***

13. On November 7, 2005, Frank Scarlota, Ms. Scarlota's father, told Mr. Gurten he believed Ms. Scarlota and the two children were staying at 7403 Dorcas Street.

14. Ms. Scarlota testified she went to visit a friend, Lee DeSousa, who lived at 7403 Dorcas Street. Ms. Scarlota testified she visited Mr. DeSousa with her nine year old son Frank but not her four year old daughter whom she believed remained with her (Ms. Scarlota's) parents.

15. Ms. Scarlota testified she did not drink alcohol on November 7, 2005 but had taken her Xanax as prescribed, one milligram pill three times a day. Ms. Scarlota testified this Xanax dosage did not impair her.

16. Mr. Gurten testified he, Mr. Scarlota (Ms. Scarlota's father), Ian Dougherty (Ms. Scarlota's brother-in-law), and Mr. Gurten's friend, Nick Blank, went to 7403 Dorcas Street around 5:00 PM on November 7, 2005 to retrieve his two children.

17. Mr. Dougherty and Mr. Blank did not testify. We evaluated testimony regarding the November 7, 2005 altercation through the distant recollections of Mr. Gurten and Ms. Scarlota, along with a police officer who later arrested Messrs. Gurten and Blank.

18. Mr. Gurten testified he asked the three men to join him because Mr. DeSousa was a "big guy," "not a nice guy," and a "badass." Mr. Gurten also needed a second driver to drive the car taken by Ms. Scarlota.

19. Mr. Gurten drove his pick-up truck to the address given to him by Mr. Scarlota. Mr. Gurten testified his unlicensed handgun remained under the driver's seat.

20. Mr. Gurten testified he left his unlicensed handgun in the pick-up truck and Mr.

Scarlota remained with his pick-up truck.

21. Mr. Gurten testified he knocked on the front door of the apartment building door because he was unsure where to find Mr. DeSousa's apartment in the four unit apartment building. An unknown man walked him to the front door of Mr. DeSousa's apartment.

22. The police reported a witness showed Mr. Gurten to Mr. DeSousa's apartment, and then saw Mr. Gurten raise up his shirt and show a gun followed by Mr. Gurten calling inside the apartment, "It's enough, it's over!" The witness immediately left the building and called 911 for emergency police response.

23. Mr. Gurten testified he knocked on Mr. DeSousa's apartment's front door and no one answered. Mr. Gurten then opened the unlocked front door and he, Mr. Dougherty, and Mr. Blank entered the apartment. Mr. Gurten testified both of the children were seated on the living room couch watching television but he did not see anyone else in the apartment.

24. Ms. Scarlota testified she was in the apartment watching television with her son Frank and Mr. DeSousa when Mr. Gurten "barged" into the apartment without knocking. Ms. Scarlota testified Mr. Gurten entered the apartment alone without mentioning her brother-in-law Mr. Dougherty or Mr. Blank.

25. Mr. Gurten testified once they entered the apartment, the children jumped off the couch and came towards him. Mr. Dougherty, their uncle, picked up the two children and left the apartment to bring them to his home.

26. Ms. Scarlota testified her father, Mr. Scarlota, removed her son Frank from the Mr. DeSousa's apartment but she did not see this happen.

27. Ms. Scarlota testified when Mr. Gurten entered the apartment she jumped up and ran to the bathroom because she was scared. She testified Mr. DeSousa followed her to the

bathroom which is off the bedroom – in a room separate from the room with the television and couch.

28. While most of the testimony is contradictory, the mother and father both agree no children saw the physical altercation between Mr. Gurten, Ms. Scarlota and Mr. DeSousa. Mr. DeSousa never spoke to Ms. Scarlota after this night and did not appear for trial.

29. Mr. Gurten testified, after the children left the apartment, Ms. Scarlota and Mr. DeSousa then came out of the apartment's bathroom and towards him. Mr. Gurten testified Ms. Scarlota came after him screaming "you don't know who you are fucking messing with" and "we'll send people to your house and to fuck with you." She appeared aggravated and slurring her words. Mr. Gurten testified he knew Ms. Scarlota was not sober having seen her high "over 100 times." Mr. DeSousa also yelled "get the fuck out of my house." Mr. Gurten testified a physical scuffle ensued with Mr. Blank attempting to pull him out the apartment while Ms. Scarlota was slapping and hitting him and Mr. DeSousa grabbed his shirt. Mr. Gurten testified he said "I'm taking the kids, this is the end."

30. Ms. Scarlota offered conflicting testimony as to what happened after she ran to the bathroom. On direct examination, she testified she exited the bathroom quickly after going in because she was not going stay in there all night. On cross-examination, she testified Mr. Gurten came in and physically removed her from the bathroom. Ms. Scarlota testified Mr. Gurten then "put a gun to her head" and threatened to kill her. Ms. Scarlota could not recall the color of the gun but believed it was a handgun. Ms. Scarlota also had difficulty recalling where Mr. Gurten placed the gun but recalls he placed the barrel of the gun against her right temple. Ms. Scarlota testified she told Mr. Gurten "shoot me." Ms. Scarlota does not recall Mr. Gurten saying anything to her. Ms. Scarlota does not recall Mr. DeSousa's location when Mr. Gurten

placed the gun to her temple.

31. Mr. Gurten testified the scuffle ended when he shoved Ms. Scarlota to get away and she fell to the floor. Ms. Scarlota testified the altercation ended because Mr. Gurten hit her but she does not know if he hit her with his fist or the unlicensed handgun.

32. Mr. Gurten testified after he pushed Ms. Scarlota to the ground, he and Mr. Blank left the apartment. We have no evidence concerning Mr. DeSousa's whereabouts.

33. Ms. Scarlota testified after Mr. Gurten hit her she landed on the ground and then awoke ten to fifteen minutes later. Ms. Scarlota testified being "obviously" visibly injured from Mr. Gurten hitting her.

34. Mr. Gurten testified Mr. Blank and he drove back to Mr. Blank's house at 451 Tyson Avenue which took about ten to fifteen minutes. Mr. Gurten testified they planned to go to Mr. Dougherty's house to get his children but he feared going there after Ms. Scarlota's and Mr. DeSousa's threats to come after him, even though he believed his children were in the home Ms. Scarlota and Mr. DeSousa threatened to come after.

35. Mr. Gurten testified he called 911 from Mr. Blank's home to report his altercation with Ms. Scarlota and Mr. DeSousa.

36. The only other testimony is offered by the arresting officer. Sergeant Uitz testified he and his partner received a dispatch to respond to a 911 call for a "person with a gun" at 7403 Dorcas Street.

37. Sergeant Uitz and his partner started towards Mr. DeSousa's apartment but then received a second dispatch the offender from 7403 Dorcas Street went to a second location, 451 Tyson Avenue – Mr. Blank's house.

38. Sergeant Uitz and his partner went to 451 Tyson Avenue where they saw Mr. Gurten and Mr. Blank. Per police protocol when facing a situation where the target may have a weapon, they exited the squad car with weapons drawn ordering Mr. Gurten and Mr. Blank onto the ground. The men complied.

39. Mr. Gurten exited Mr. Blank's house when he saw the police vehicle arrive but then realized something was wrong because "a lot" of police cars arrived and drove onto the lawn. The officers jumped out with their guns drawn saying "get on the ground." Mr. Gurten obeyed and the officers began questioning him and he tried to explain the "misunderstanding."

40. Ms. Scarlota testified the police officers, notwithstanding her alleged head injuries from being hit or her fall to the ground after being pushed, took her to identify Mr. Gurten at Mr. Blank's apartment. Ms. Scarlota testified she does not recall speaking to the officers because she was in shock.

41. Sergeant Uitz testified in his practice he would, depending on the severity of the victim's injuries, ordinarily take the victim to identify the assailant before going to the hospital.

42. Mr. Gurten testified he told the officers he had a gun in his pick-up truck. Sergeant Uitz does not recall Mr. Gurten telling him where his gun was located but recalled Mr. Gurten gave a detective consent to search the truck and the detective discovered Mr. Gurten's handgun there.

43. Ms. Scarlota identified Mr. Gurten as the man who had a gun and attacked her. Ms. Scarlota then testified police officers took her to the hospital where she was admitted for head and elbow injuries. The parties did not proffer medical or hospital records.

44. Mr. Gurten testified the officers arrested him, placed him in a squad car, and took him into custody. The police officers described the crime as "aggravated assault – domestic

abuse by handgun."

45. The Philadelphia District Attorney charged Mr. Gurten with aggravated assault, carrying firearms without a license, carrying firearms in public in Philadelphia, possessing instruments of crime, terroristic threats, simple assault, and recklessly endangering another person.

46. At some point, Ms. Scarlota decided she did not want to testify against Mr. Gurten because she wanted to "try and keep the family together."

47. Mr. Gurten pleaded guilty to carrying a firearm without a license, carrying the unlicensed firearm in public in Philadelphia, and simple assault. We have no record of his plea colloquy. The only contemporaneous evidence is a police report, admitted into evidence without objection, describing part of Ms. Scarlota's claim of gun use. In the arrest report, Ms. Scarlota gives different, though not incompatible facts. Ms. Scarlota told the officers Mr. Gurten pulled her out of the bathroom and threw her to the floor with no mention of a gun but later told officers Mr. Gurten grabbed her by her arm and pointed a gun at her and took their two children when she identified him at Mr. Blank's house.

48. The arrest report recounts interviews with two witnesses. Witness one told officers he was in the bathroom with Ms. Scarlota when Mr. Gurten pulled out a gun and pointed it at them. Witness one stated Mr. Gurten hit Ms. Scarlota with his fist, not his gun and knocked her to the ground. Sergeant Uitz testified witness one is Glenn Bernstein. Based on the testimony of Mr. Gurten and Ms. Scarlota, this witness is Lee DeSousa, not Mr. Bernstein.

49. Witness two told the officers he was leaving Mr. DeSousa's apartment when he encountered Mr. Gurten entering the building. Mr. Gurten told witness two he wanted to see Mr. DeSousa and witness two went back towards Mr. DeSousa's apartment with Mr. Gurten

following behind. Witness two stated he turned around to look at Mr. Gurten and Mr. Gurten pulled his shirt up to reveal a handgun then yelled into Mr. DeSousa's apartment "[it's enough, it's over." Witness two fled the apartment building, drove a block away, and then called 911 to report Mr. Gurten had a gun. Sergeant Uitz testified witness two is Lee DeSousa. Based on witness two's recount and the testimony together, witness two is Mr. Bernstein, not Mr. DeSousa.

50. The sentencing judge classified Mr. Gurten's convictions for carrying a firearm without a license and carrying a firearm in public as misdemeanors in the first degree punishable by up to five years imprisonment and his simple assault conviction as a misdemeanor in the second degree punishable by up to two years imprisonment. The judge sentenced Mr. Gurten to probation for three years, twenty hours of community service, and court costs for his carrying firearms without a license with no further penalty on his other two convictions.

51. After evaluating the witnesses' credibility in the widely divergent testimony, we cannot credit Ms. Scarlota's testimony she did not know of her longtime boyfriend's handgun. He kept the gun in her house and under his car seat. He claimed to be a hunter as a child and, as a contractor, thought he needed a gun. We find Ms. Scarlota knew of the handgun and, after the altercation and while at Mr. Blank's, first told the police about the gun.

52. It is difficult to believe Mr. Gurten as to his reactive conduct and non-use of the handgun once in the apartment building and during the altercation. Mr. Gurten brought two extra men with him because he thought Mr. DeSousa was a "big guy" and a "badass." He swore he left Ms. Scarlota's father downstairs with the truck so as to not be exposed to the anticipated potential violence in the apartment involving his daughter. The police reported Mr. Gurten showed his gun to the man opening the door while rushing to the second floor apartment. Ms.

Scarlota and "big guy" Mr. DeSousa undisputedly ran into the bathroom upon Mr. Gurten entering the apartment. We find it hard to believe they would run and hide in the bathroom simply because Mr. Gurten entered the apartment. It is more credible he showed a gun or, at a minimum, threatened to use a gun. They only came out of the bathroom–either voluntarily or forcibly–when the children safely exited the apartment with their uncle. We cannot imagine why they came out of the bathroom other than being scared not to. We cannot believe Ms. Scarlota attacked Mr. Gurten and he simply defended himself causing her to fall on the ground. We find the testimony concerning her falling to the ground to be credible but find Mr. Gurten pushed or hit her to the ground where she injured her elbow.

53. We credit Ms. Scarlota's testimony concerning the showing and possible use of the gun as part of the domestic assault arising from a father's loss of temper at perceiving his impaired girlfriend's taking their children for days to an apartment of an unknown "bad ass" "big guy". Mr. Gurten's testimony of being attacked by Ms. Scarlota does not make sense in light of his anger at her and going over in his truck with three other men and his gun to get the children.

54. We also find Mr. Gurten's decision to retreat to Mr. Blank's house – rather than go and immediately get his children from their uncle – to be perplexing at best. Why did he have to fear Ms. Scarlota and Mr. DeSousa unless he feared they would come after him with vengeance?

55. The timing of the altercation also suggests Mr. Gurten's testimony is not credible as to his conduct. Why did he and Mr. Blank stay behind in the apartment after he safely removed his children if not to harm Ms. Scarlota and Mr. DeSousa? Why would they come out of the bathroom unless he forced them? Why would a third party tell the police Mr. Gurten had shown a gun before entering the apartment and said "it's enough, it's over!" upon entering Mr.

DeSousa's apartment?

56. Even if we discounted the police report and the substantial circumstantial evidence of using the unlicensed handgun, we would find violence exhibited by Mr. Gurten even without the use of his handgun. Mr. Gurten – possibly with Mr. Blank – stayed in the apartment for no reason other than to punish Ms. Scarlota and possibly Mr. DeSousa. He undisputedly hit his longtime girlfriend and mother of his two children. She fell on the ground. She suffered injury to her head and elbow. Tellingly, there is no evidence of injury to Mr. DeSousa, whom one would think, as a "bad ass" "big guy", would have defended his friend Ms. Scarlota from Mr. Gurten. While Mr. Gurten may have been understandably angry with her over perceived drug abuse and disappearing with their children, we have no doubt he manifested his anger through physical violence towards his domestic partner. He could have taken the children and drove away. He could have immediately driven to see his children at the uncle's house especially after the traumatic events in the last half hour and having not seen them for several days. Instead, he stayed with Ms. Scarlota and hit her or at least pushed her hard enough to send her to the hospital.

57. Mr. Gurten, with or without using his unlicensed handgun, acted violently with the purpose of harming his domestic partner and mother of his children.

## II. **Conclusions of Law**

58. In 2016, Mr. Gurten attempted to purchase a firearm but the Pennsylvania State Police informed him 18 U.S.C. § 922(g)(1) prohibits him from purchasing a firearm based on his convictions for carrying a firearm without a license and carrying a firearm in public.

59. Mr. Gurten sued Attorney General Jeffery Sessions and Acting Director of the Bureau of Alcohol Tobacco and Firearms Thomas E. Brandon asking us to declare § 922(g)(1) is

unconstitutional as applied to him because he did not commit a serious crime which historically disqualifies an individual from Second Amendment rights.

60. Our court of appeals allows persons convicted of state law misdemeanors punishable by more than two years in prison to challenge § 922(g)(1) as unconstitutional as-applied to their Second Amendment right to keep and bear arms.[2]  To succeed in an as-applied challenge to § 922(g)(1), Mr. Gurten must satisfy the two prongs of *United States v. Marzzarella*.[3]  Under *Marzzarella*'s first prong, Mr. Gurten bears the burden of identifying the traditional justifications for excluding individuals who commit crimes punishable by more than one year in prison under § 922(g)(1), and then distinguish his conviction from the serious crimes of the "historically barred class."[4]  If Mr. Gurten successfully distinguishes his disqualifying conviction from "serious crimes," the burden under *Marzzarella* then shifts to the United States to show § 922(g)(1) as-applied to Mr. Gurten satisfies intermediate scrutiny, i.e., whether prohibiting Mr. Gurten from possessing firearms is substantially related to an important government interest.[5]

61. Under 18 U.S.C. § 922(g)(1), federal law prohibits a person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year," including a person convicted of a state law misdemeanor punishable by more than two years in prison, from obtaining or possessing a firearm.

62. Mr. Gurten's guilty plea to violating 18 Pa.C.S. § 6106 by carrying a firearm without a license is graded as a misdemeanor in the first degree punishable by up to five years in prison.  His plea to violating 18 Pa.C.S. § 6108 carrying a firearm in public in Philadelphia is graded as misdemeanor in the first degree punishable by up to five years in prison. His plea to violating 18 Pa.C.S. § 2701 (simple assault) is graded as a misdemeanor in the second degree

punishable by up to two years in prison.

63. Section 922(g)(1) applies to Mr. Gurten because he pleaded guilty to two misdemeanors punishable by more than two years in prison. Mr. Gurten's convictions also meet the "traditional" definition of a felony because they are punishable by imprisonment for a term exceeding one year.[6] Because Mr. Gurten's convictions meet the traditional definition of a felony, under *District of Columbia v. Heller*, he is subject to a "presumptively lawful" ban on his Second Amendment right to keep and bear arms.[7]

64. The traditional justification for disarming felons is the government's right to disarm "unvirtuous citizens" who "committed serious crimes."[8] Our court of appeals held persons who commit violent crimes "undoubtedly qualify as 'unvirtuous citizens,'" but the "category of 'unvirtuous citizens' is [] broader than violent criminals; it covers any person who has committed a serious criminal offense, violent or nonviolent."[9]

65. Mr. Gurten bears the burden of distinguishing his disqualifying crime from "serious crimes" and while there is "no fixed criteria," our court of appeals identifies four factors: (1) whether the state legislature classified the crime as a felony or a misdemeanor; (2) whether violence is an element of the crime; (3) the individual's actual punishment set by the court; and (4) whether there is a "cross-jurisdictional consensus regarding the seriousness of the [] crime."[10]

66. As to the first factor, the Commonwealth considers Mr. Gurten's disqualifying conviction under § 6106 a serious crime because it is classified as a felony of the third degree. Pennsylvania's General Assembly only allows a court to reclassify a violation of § 6106 as a misdemeanor if the defendant has "not committed any other criminal violations" and here, Mr. Gurten committed two other criminal violations rendering the exception unavailable to him as a

matter of law regardless of how the individual judge classified his conviction.[11]

67. As to the second factor, the elements of Mr. Gurten's disqualifying convictions do not have actual and attempted violence as an element. But there is evidence through his contemporaneous conviction, arrest report, charging documents, and evidence adduced at trial Mr. Gurten used actual violence which we cannot ignore. Actual or attempted violence is not an element of § 6106 which requires a person carry a concealed firearm on his person or in his vehicle without a valid license. While actual or attempted violence is also not element of § 6108, an element is a person carries an unlicensed firearm "upon the public street or upon public property" in Philadelphia. The record is not devoid of violence underlying Mr. Gurten's convictions; instead, there is credible evidence Mr. Gurten used his handgun to threaten Ms. Scarlota and Mr. DeSousa and physically assaulted his domestic partner, including but not limited to his guilty plea to simple assault.

68. As to the third factor, Mr. Gurten's two disqualifying convictions for misdemeanors of the first degree exposed him to up to five years in prison for each conviction. After his guilty plea, the state court judge sentenced Mr. Gurten to three years' probation, twenty hours of community service, and court costs. Mr. Gurten's relatively light sentence weighs against the label of "serious crimes;" however, we accord this element less weight because there is credible evidence the judge's sentence did not reflect a true "assessment of how minor the violations were" because Ms. Scarlota declined to testify against Mr. Gurten in an attempt to reunite her family.[12]

69. As to the fourth factor, there is no cross-jurisdictional consensus on carrying a firearm without a valid license because while some states consider it a serious crime from a sentencing standpoint, more than half of the states do not because their maximum sentence is for

less than one year imprisonment making it not a traditional felony.[13]  Mr. Gurten's conviction for carrying a firearm in public in Philadelphia also lacks a consensus because it only applies within the city limits.

70. Mr. Gurten fails to distinguish his conviction from the "serious crimes" which historically barred persons from the right to keep and bear arms because he fails to overcome the Commonwealth's classification of his § 6106 conviction as a felony of the third degree where a judge incorrectly graded his individual conviction because, for this element, we focus on the legislature's classification, not Mr. Gurten's individual circumstances.  The Commonwealth's use of the felony label makes Mr. Gurten's burden "extraordinarily high– and perhaps even insurmountable" and he does not surmount it with evidence of non-violence, a relatively light sentence, or a lack of cross-jurisdictional consensus.

71. Even if Mr. Gurten met his burden on the first prong of *Marzzarella*, the United States satisfies intermediate scrutiny by showing the Congressional prohibition on Mr. Gurten from possessing a firearm is "substantially related" to the "important" government interest of "promoting public safety by 'preventing armed mayhem'"[14] because there is credible evidence Mr. Gurten carried his unlicensed firearm in public in a major city, used his firearm to threaten people, and physically assaulted his domestic partner.

72. Mr. Gurten has not met his burden of showing the application of §922(g)(1) upon him is unconstitutional as applied.

**III.     Analysis**

Congress prohibits persons convicted of serious crimes from obtaining and possessing a firearm.  Congress prohibits persons convicted of the traditional definition of a felony - a crime punishable by more than one year in prison - from possessing a firearm.  Recognizing the

overlap between the traditional definition of felony and states enacting harsher punishments for a misdemeanor, Congress drew a line: allowing persons convicted of state law misdemeanors punishable by <u>less than two years</u> in prison to obtain or possess a firearm but prohibiting possessing a firearm for those convicted of state law misdemeanors punishable by <u>more than two years</u> in prison.[15]  Congress' prohibition on firearms applies to Mr. Gurten based on his plea to two misdemeanors punishable by more than two years in prison.

Given the temporal deadlines may not always be appropriate, our court of appeals allows persons convicted of state law misdemeanors punishable by more than two years in prison to challenge Congress' prohibition on firearm possession.  To succeed in his challenge, a challenger seeking to obtain or possess a firearm must show the circumstances of his disqualifying conviction are different from persons convicted of "serious crime" historically barred from possessing a firearm.

Persons convicted of state law misdemeanors punishable by a term imprisonment of more than two years may challenge § 922(g)(1) application as unconstitutional as-applied to their Second Amendment rights.[16]  It is a two part test under *Marzzarella*, where the challenger bears the burden of identifying the traditional justifications for excluding individuals who commit crimes punishable by imprisonment for more than one year under § 922(g)(1), and then distinguishing his conviction from the serious crimes of the "historically barred class."[17]  If the challenger meets this burden, the United States must show § 922(g)(1)  as applied to the challenger satisfies intermediate scrutiny.

We closely review our court of appeals' plurality and concurring opinions in *Binderup* for guidance on analyzing an as-applied challenge. But today, we face two novel issues not present in *Binderup*: (1) while Mr. Gurten pleaded guilty to a disqualifying conviction graded as

a misdemeanor, the Commonwealth and the Pennsylvania Supreme Court are clear his disqualifying conviction is classified as a felony; and (2) Mr. Gurten's disqualifying convictions do not have actual or attempted violence as an element but he contemporaneously pleaded guilty to simple assault and our evaluation of the credibility of witness testimony at trial confirms he committed physical violence against his domestic partner and used a firearm to threaten others. Rather than helping Mr. Gurten meet his burden, we find both of these distinctions weigh decidedly in favor of finding he does not meet his burden and do not change our finding Mr. Gurten pleaded guilty to two serious crimes under Pennsylvania Law.

### A.    Mr. Gurten does not meet his burden under *Marzzarella*'s first prong.

Mr. Gurten fails to distinguish his disqualifying convictions from the "serious crimes" because Pennsylvania classified his conviction as a felony, he used physical violence in the commission of his crime, and his probationary sentence does not reflect the full measure of his criminal conduct.

In *Binderup*, our court of appeals, sitting *en banc*, consolidated the as-applied challenges of Daniel Binderup and Julio Suarez, both convicted of state law misdemeanors punishable by more than two years in prison.  Mr. Binderup, at 41 years old, had a consensual sexual relationship with his 17 year old employee.[18] Mr. Binderup pleaded guilty to corrupting a minor, a misdemeanor punished by up to five years in prison and the Pennsylvania state court judge sentenced him to three years' probation, $300 fine, court costs, and restitution.[19]  Maryland police officers stopped Mr. Suarez for driving under the influence and during the stop, the officers discovered he had an unlicensed handgun in his vehicle.[20] Mr. Suarez pleaded guilty to carrying an unlicensed firearm which Maryland classifies as a misdemeanor punishable by up to three years in prison.[21]  It is unclear if Mr. Suarez also pleaded guilty to charges for driving

under the influence. Most germane to today's analysis are the facts surrounding their disqualifying convictions were not disputed and there was no evidence either Mr. Binderup or Mr. Suarez committed or threatened violence in any form during the commission of their crimes.[22]

While Judge Ambro noted there is "no fixed criteria for determining whether crimes are serious enough to destroy Second Amendment rights," the court of appeals distinguished Messrs. Binderup's and Suarez's disqualifying convictions from those "serious crimes" based on the four factors: (1) state legislatures codified their offenses as misdemeanors; (2)their offenses did not have an element of actual or attempted violence; (3) their punishments were minor relative to the possible maximum; and, (4) a lack of cross-jurisdictional agreements regarding the seriousness of their crimes.[23]

We address Mr. Gurten's arguments for each factor, "presum[ing] the judgment of the legislature is correct and treat any crime subject to § 922(g)(1) as disqualifying unless there is strong reason to do otherwise."[24] After close examination of the record and *Binderup*, Mr. Gurten does not meet his burden of providing a "strong reason" to treat his disqualifying offenses as not serious crimes.[25]

### 1. The Commonwealth codified Mr. Gurten's conviction as a felony.

Mr. Gurten does not meet his burden to show the Commonwealth codified his conviction as a misdemeanor, not a felony. In *Binderup*, there is no dispute Messrs. Binderup and Suarez's disqualifying convictions were enacted by the state legislatures as misdemeanors and this "classification is a powerful expression of its belief that the offense is not serious enough to be disqualifying."[26]

Even though the state court judge graded Mr. Gurten's conviction under § 6106 (carrying

a firearm without a license) as a misdemeanor, Pennsylvania's General Assembly enacted Mr. Gurten's conviction as a felony. Mr. Gurten argues we should not look past his individual guilty plea to determine if higher charges should have been brought. We disagree. Our court of appeals first looked at how the state legislature classified the offense when it "enacted" it, which is an inquiry into the legislature's prerogative, not the result reached by an individual judge or district attorney. Second, Mr. Gurten's argument mischaracterizes the issue because the grading of § 6106 is not a matter of the severity of his conduct. Rather, we lack discretion under § 6106 and Pennsylvania Supreme Court precedent to re-classify Mr. Gurten's conviction as a misdemeanor based on his two other convictions. The level, or lack of, severity in his actions in the one crime is not a factor.

The General Assembly classified a violation of § 6106, carrying a firearm without a license, as a felony of the third degree without exception until 1997.[27] In 1997, the General Assembly amended the statutory language of § 6106 to create an exception allowing a person carrying a firearm without a license where the person is otherwise eligible for a license and "had not committed any other criminal violations," to be classified as a misdemeanor of the first degree.[28] The Commonwealth enacted Mr. Gurten's § 6106 conviction as a felony of the third degree unless Mr. Gurten committed no other criminal violations, and here, Mr. Gurten pleaded guilty to two other criminal violations with his § 6106 conviction.

The Pennsylvania Supreme Court addressed how the newly enacted misdemeanor exception to § 6106 applied in *Commonwealth v. Bavusa*, decided two years before Mr. Gurten's 2005 conviction.[29] The state court, after a bench trial, convicted a defendant of violating both § 6106 and § 6108 for carrying an unlicensed firearm in public in Philadelphia.[30] The supreme court held the misdemeanor exception is not a new element or an affirmative defense to § 6106

violation but a sentencing factor to be considered by the judge after conviction.[31]  In other words, a defendant's conviction for violating § 6106 is graded as a felony of the third degree unless, at sentencing, the defendant can show he is otherwise eligible for license and did not commit a criminal violation.  The supreme court held the defendant's second conviction, violating § 6108, prevents the misdemeanor exception from applying to his § 6106 conviction at sentencing because he committed another criminal violation.[32]

The Pennsylvania General Assembly classifies Mr. Gurten's § 6106 conviction as a felony because he committed other criminal violations along with his § 6106 conviction, including contemporaneous convictions for § 6108.  Similar to the defendant in *Bavusa*, the misdemeanor exception is statutorily unavailable to Mr. Gurten.  The sentencing judge's incorrect grading of Mr. Gurten's § 6106 conviction as a misdemeanor is not a "strong reason" to ignore the General Assembly's enacting § 6106 as a felony because it is the General Assembly's classification which counts, not one judge's view as later rejected by Pennsylvania courts.[33]  In a footnote, our court of appeals noted it was "not confronted with whether an as-applied challenge can succeed where the purportedly disqualifying offense is considered a felony by the authority that created the crime" the burden in that case would be "extraordinarily high--and perhaps even insurmountable…"[34]

Mr. Gurten fails to meet his burden to show the Commonwealth labeled his conviction a misdemeanor where the simple statutory language and supreme court precedent undisputedly confirms the Commonwealth considers his violation of § 6016 in tandem with another criminal violation a felony.  Mr. Gurten's burden to distinguish his disqualifying conviction from a serious crime is now "extraordinarily high."  As shown, he fails to meet this extraordinarily high standard.

**2.** **Mr. Gurten's disqualifying convictions are serious crimes despite the lack of an element of violence in the underlying offenses.**

We then evaluate whether Mr. Gurten's disqualifying convictions are for "violent criminal conduct—meaning a crime 'in which violence (actual or attempted) is an element of the offense'…."[35] In *Binderup*, the court of appeals found neither Mr. Binderup nor Mr. Suarez's disqualifying offenses included attempted or actual violence as an element, and though "it is possible for non-violent crimes to be serious, the lack of a violence element is a relevant consideration."[36]

Mr. Gurten's disqualifying convictions do not have violence, actual or attempted, as an element. The lack of a violent element, in and of itself, is not a strong reason to find Mr. Gurten's disqualifying convictions are not serious crimes because one conviction is classified as a felony, and his convictions are closely related to violence based on his contemporaneous simple assault conviction, the police report, and evidence adduced during our trial.

Our court of appeals held non-violent crimes can be serious crimes. Mr. Gurten's disqualifying convictions are for serious crimes based on the Commonwealth's classification and the nature of the prohibited conduct. The Commonwealth recognized the seriousness of Mr. Gurten's conviction when it created a statutory distinction between persons who carry an unlicensed firearm while committing other criminal violations (a felony) and those who only carry an unlicensed firearm (a misdemeanor). Mr. Gurten's second disqualifying conviction is also a serious crime because the Commonwealth enacted a specific statute criminalizing the same conduct, carrying an unlicensed firearm, because of the location of the conduct, "public streets or public property in Philadelphia."[37] The fact the Commonwealth chose to classify Mr. Gurten's conduct as a felony when committed with another crime and to additionally criminalize his same conduct when it occurred in public in a major metropolis confirms the Commonwealth

considers Mr. Gurten's disqualifying convictions to be serious crimes.

While the undisputed, violence-free records of Messrs. Binderup and Suarez may have made analyzing this category simple, but our issue is complicated by Mr. Gurten's contemporaneous conviction for simple assault, arrest report, charging documents, and evidence adduced at trial Mr. Gurten used actual violence which we cannot ignore.

The lack of violent conduct from Messrs. Binderup and Suarez influenced the court of appeals' finding they were not serious crimes. Both Judge Ambro and Judge Hardiman noted the lack of violent conduct and highlighted the strong tie between violence and the label of serious crimes.[38] Judge Ambro, in a footnote addressing factor, stated while "we look only to a crime's elements rather than to the way it was actually committed," he specifically noted both the record of Mr. Binderup's and Mr. Suarez's convictions were devoid of violent conduct.[39] Judge Hardiman, in his concurrence, focused even more on the importance of the lack of violent conduct, and not just the elements of the conviction, when examining whether Messrs. Binderup and Suarez distinguished themselves from "persons not entitled to keep and bear arms because of their propensity for violence."[40] Judge Hardiman found their convictions did not meet the traditional crimes of violence warranting dispossession but then looked past the elements of crime into the factual events underpinning their convictions. Judge Hardiman looked at Mr. Binderup's conviction for corrupting the morals of a minor and highlighting the district court's finding "simply nothing in the record" suggested he used violence in the relationship, and stated if there were facts suggesting "implicit or genuine violence" in their relationship "[s]uch facts would make his a much different case."[41] Judge Hardiman also distinguished Mr. Suarez's convictions for driving under the influence and carrying an unlicensed firearm as "neither involved the actual use or threatened use of force, nor was it 'closely related to a violent

crime…"[42]

Mr. Gurten's disqualifying convictions for carrying an unlicensed firearm in public in Philadelphia is "closely related" to violent crime. Mr. Gurten pleaded guilty to simple assault for hitting his domestic partner while possessing an unlicensed firearm. Mr. Gurten may have threatened persons with his firearm, unlike in *Binderup*, where "simply nothing in the record" suggested Mr. Binderup used violence toward the minor or Mr. Suarez used violence when stopped for drunk driving, even though officers discovered an unlicensed firearm in his vehicle during the stop.[43]

### 3. Mr. Gurten's probationary sentence carries little weight given the limited evidentiary record before the sentencing judge.

Mr. Gurten's two disqualifying convictions for misdemeanors of the first degree exposed him to five years in prison for each conviction. After a guilty plea, the state court judge sentenced Mr. Gurten to three years' probation, twenty hours of community service, and court costs. In *Binderup*, Mr. Binderup could have been sentenced to five years in prison but instead received three years' probation and fines and Mr. Suarez could have been sentenced to up to three years imprisonment but instead received a suspended sentence of 180 days in jail and fines.[44] The court of appeals held the actual punishments are relevant because sentencing judges have "firsthand knowledge of the facts and circumstances of the cases and who likely have the benefit of a pre-sentence reports prepared by trained professionals" and the lack of jail time reflects the judge's "assessment of how minor the violations were."[45]

Mr. Gurten's relatively light sentence weighs against the label of "serious crimes." But we accord this element less weight because there is credible evidence the judge's sentence did not reflect a true "assessment of how minor the violations were" because Ms. Scarlota declined to testify against Mr. Gurten.[46] The district attorney charged Mr. Gurten with aggravated assault,

carrying firearms without a license, carrying firearms in public, possessing instruments of crime, terroristic threats, simple assault, and recklessly endangering another person. Ms. Scarlota, the main victim declined to testify, meaning the district attorney would have difficultly proving most of the charges. Mr. Gurten then pleaded to only three charges but, without the benefit of plea colloquy, we do not what facts the sentencing judge heard, or whether the sentence is the product of negotiations between counsel or trial judge hearing facts and analyzing a pre-sentence report to truly assess Mr. Gurten's conduct.

Mr. Gurten does not meet his burden of showing his probationary sentence distinguishes his conviction from a serious crime because it is more likely than not the sentencing judge did not consider Mr. Gurten's full conduct based on Ms. Scarlota's unwillingness to testify and Mr. Gurten did not adduce evidence at our trial, such a plea colloquy or sentencing transcript, to persuade us otherwise.

4.      **There is no cross-jurisdictional analysis as to the seriousness of Mr. Gurten's convictions.**

There is no cross-jurisdictional consensus regarding the seriousness of Mr. Gurten's convictions. In *Binderup*, our court of appeals found the lack of agreement among states as to the seriousness of Mr. Binderup's and Mr. Suarez's convictions makes their burden of distinguishing their convictions "much more compelling."[47]

Relevant to Mr. Gurten is the court of appeals' analysis of Mr. Suarez's conviction for carrying a firearm without a license where it held "…more than half [of the states] prescribe a maximum sentence that does not meet the threshold felony (more than one year in prison) and others do not even require a specific credential to carry a concealed weapon."[48] Meaning there is no cross-jurisdictional consensus on the sentence for Mr. Gurten carrying a firearm without a valid license conviction.[49] Mr. Gurten's other conviction for carrying a firearm in public in

Philadelphia also lacks a consensus because it only applies within the city limits. While Mr. Gurten shows a lack of consensus among the states as to the seriousness of his disqualifying convictions, this showing does not overcome the fact Pennsylvania considers Mr. Gurten's § 6106 conviction to be a felony because Pennsylvania's felony classification of Mr. Gurten's conviction is more directly at issue than the views of other states regarding firearms within their boundaries.

### B.     The United States satisfies intermediate scrutiny.

Even if Mr. Gurten met his burden on the first prong of *Marzzarella*, the United States satisfies intermediate scrutiny by showing the Congressional prohibition on Mr. Gurten from possessing a firearm is "substantially related" to the "important" government interest of "promoting public safety by 'preventing armed mayhem'". After evaluating the credibility of witnesses, we found credible evidence Mr. Gurten carried his unlicensed firearm in public in Philadelphia, used his firearm to threaten people, and physically assaulted his domestic partner.[50]

In *Binderup*, in the absence of violent conduct or subsequent criminal history of Messrs. Binderup and Suarez, the United States "relie[d] on off-point statistics to argue that it is reasonable to disarm [them] because of their convictions."[51] The court of appeals held their "isolated, decades-old, non-violent misdemeanors do not permit the inference that disarming people like them will promote the responsible use of firearms" and found "there is not a substantial fit between the continuing disarmament of [Messrs. Binderup and Suarez] and an important government interest."[52]

Unlike *Binderup*, there is a substantial fit between disarming Mr. Gurten, a man who physically assaulted his domestic partner and carried an unlicensed firearm in public in Philadelphia and "promoting public safety by 'preventing armed mayhem.'"[53] Mr. Gurten

argues he has no further criminal violations since November 7, 2005 and his conduct one night "hardly justifies a lifetime revocation of a core civil liberty."[54] While Mr. Gurten remaining a law abiding citizen for 12 years may be some evidence of controlling his temper with his handgun and possibly rehabilitation, it does not overcome the fact he physically assaulted his domestic partner and used his unlicensed firearm to threaten others. The United States has an important interest in applying § 922(g)(1) to Mr. Gurten given his specific violent conduct resulting in convictions of multiple crimes involving unlicensed firearms.

## IV.    Conclusion

Faced with Mr. Gurten's § 922(g)(1) disqualifying convictions, his guilty plea to "non-violent" firearm licensing violations which are belied by a contemporaneous conviction for simple assault and a record suggesting he committed physical violence against his domestic partner, we could not decide his as-applied challenge based on the classification, elements, punishment, and cross-jurisdictional factors surrounding Mr. Gurten's qualifying convictions on a summary judgment record. We held a bench trial to determine credibility and resolve the fact disputes adduced by the parties at summary judgment.

We thus faced a fact finding exercise when the state court conviction does not follow an evidentiary process or we have no transcript of the plea colloquy. Our fact finding required under *Binderup* involved hearing evidence, for the first time, of the facts resulting in the guilty plea to convictions of two crimes punishable by up to five years in prison.[55]

After evaluating the credibility of conflicting testimony, reviewing admitted exhibits and applying our court of appeals' guidance in *Binderup* and *Marzzarella*, we deny Mr. Gurten's challenge to §922(g)(1) as unconstitutional as-applied to him because he fails to meet his burden showing his disqualifying convictions are not "serious crimes" warranting the ban on his Second

Amendment right to keep and bear arms. Mr. Gurten fails to distinguish his two convictions from the "serious crimes" which historically barred persons from the right to keep and bear arms because he fails to overcome the General Assembly's classification of his § 6106 conviction as a felony of the third degree where a judge incorrectly classified his individual conviction because, for this element, we focus on the legislature's classification, not Mr. Gurten's individual circumstances. The level of seriousness confirmed by Pennsylvania's use of the felony label means Mr. Gurten's burden is "extraordinarily high– and perhaps even insurmountable." He does not meet this standard by showing his disqualifying convictions lacked an element of violence.

Even if Mr. Gurten met his burden, the United States satisfies intermediate scrutiny as-applied to Mr. Gurten because a substantial fit between disarming Mr. Gurten and the important government interest of "promoting public safety by 'preventing armed mayhem.'"[56]

---

[1] 836 F.3d 336, 351 (3d Cir. 2016), *cert. denied sub nom. Sessions v. Binderup*, 137 S. Ct. 2323 (2017), *and cert. denied sub nom. Binderup v. Sessions*, 137 S. Ct. 2323 (2017).

[2] *See Binderup,* 836 F.3d at 346 (citing *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)).

[3] *Marzzarella*, 614 F.3d 89.

[4] *Binderup*, 836 F.3d at 347.

[5] *Id.*

[6] *See id.* (internal citations omitted) ("Traditionally, 'felons' are people who have been convicted of any crime "that is punishable by death or imprisonment for more than one year").

[7] *See id.* at 348 (citing *District of Columbia v. Heller*, 554 U.S. 570, 626-27 n.26 (2008) (their convictions meet the traditional definition of felonies and "[a]s a result, Binderup and Suarez are subject to a firearm ban that is, per *Heller*, "presumptively lawful").

[8] *Id.* at 348-49.

[9] *Id.* (internal citations omitted).

[10] *Id.* at 352.

[11] 18 Pa.C.S. § 6106(a)(2).

[12] *See Binderup*, 836 F.3d at 352.

[13] *Id.* at 352-53.

[14] *Id.* at 353 (quoting *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010)).

[15] 18 U.S.C. § 921(a)(20)(B) exempt "any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less" from § 922(g)(1)'s prohibitions.

[16] *Binderup*, 836 F.3d at 347 (citing *Marzzarella*, 614 F.3d at 89).

[17] *Id.* at 346.

[18] *Id.* at 340.

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.* at 352 n.4.

[23] *Id.* at 351-52.  Two other district courts analyzed these four factors at the motion to dismiss stage as a non-exhaustive test to determine the seriousness of challenger's disqualifying convictions although neither case is factually helpful because both disqualifying convictions were for the misdemeanor in the first degree -  driving under the influence with the highest level of blood alcohol level.  *See Holloway v. Sessions*, --- F. Supp. 3d ---, 2017 WL 3077035, at *5-7 (E.D. Pa. 2017) (finding a challenger stated a plausible claim § 922(g)(1) as-applied to his non-violent driving under the influence misdemeanor may not be a serious crime under *Binderup*); *Zedonis v. Lynch*, 233 F. Supp. 3d 417, 427 (M.D. Pa. 2017) (finding a challenger stated a plausible claim § 922(g)(1) as-applied to his non-violent driving under the influence misdemeanor may not be a serious crime under *Binderup*).

We also have not applied these four factors but still derive guidance from *Binderup* when addressing the as-applied constitutionality of § 922(g)(4) which prohibits the possession of firearms by persons previously involuntarily committed.  *See, e.g., Keyes v. Sessions*, --- F. Supp.

3d ---, 2017 WL 4552531 (M.D. Pa. 2017); *Jefferies v. Session*, --- F. Supp. 3d ---, 2017 WL 4411044, at *1 (E.D. Pa. 2017); *Beers v. Lynch*, No. 16-6440, Slip. Op. at 8 (E.D. Pa. Sept. 5, 2017); *Simpson v. Sessions*, No. 16-1334, 2017 WL 1910141 (E.D. Pa. May 10, 2017). *But see Franklin v. Sessions*, No. 16-36, 2017 WL 6550699 (W.D. Pa. Dec. 21, 2017) (addressing the statutory interpretation of § 922(g)(4) and avoiding addressing constitutionality under *Binderup*)

[24] *Id.* at 351.

[25] *See id.*

[26] *Id.*

[27] 18 Pa.C.S. § 6106(a).

[28] § 6106(a)(2).

[29] 832 A.2d 1042, 1044 (Pa. 2003).

[30] *Id.*

[31] *Id.* at 1056.

[32] *Id.*

[33] Since Mr. Gurten's 2005 conviction, Pennsylvania courts have clarified a sentencing judge does not have the discretion to classify a defendant's § 6106 conviction as a misdemeanor "because [defendant's] contemporaneous Section 6108 conviction independently precluded the court from downgrading the Section 6106 offense from a third-degree to a first-degree misdemeanor." *Commonwealth v. Mendozajr*, 71 A.3d 1023, 1027 (Pa. Super. 2013); *see also Commonwealth v. Anderson*, 235 EDA. 2015, 2016 WL 5076145 at *5 (Pa. Super. July 12, 2016) *appeal denied*, 160 A.2d 780 (2016) (the District Attorney charged the defendant with violations of § 6106 and § 6108 but later dismissed by *nolle prosequi* the charges under § 6108. Defendant pleaded guilty to § 6106 and the sentencing judge graded his conviction as a misdemeanor. The Pennsylvania Superior Court vacated the sentence holding the defendant's § 6106 conviction "must be graded as a third-degree felony" because of the now withdrawn § 6108 charge and remanded the case for resentencing).

The Pennsylvania courts have also addressed the constitutionality of this outcome. A defendant challenged this interplay between § 6106 and § 6108 arguing it violated due process and equal protection because a person convicted of § 6016 in Philadelphia is precluded from a misdemeanor grading due to § 6108 whereas a person convicted of only § 6106 anywhere else in Commonwealth would be convicted of a misdemeanor. *Commonwealth v. Scarborough*, 89 A.2d 679, 685 (Pa. Super. 2014) *appeal denied*, 628 Pa. 622 (Pa. 2014). The Pennsylvania Superior Court held the right to carry an unlicensed firearm on the streets of Philadelphia is not a protected right under the Second Amendment and a person who "carries a concealed weapon in

Philadelphia will always face enhanced sentencing exposure on a third degree felony." *Id.* at 686-87; *accord Commonwealth v. Lincoln*, 2740 EDA 2012, 2013 WL 11260839 at *2 (Pa. Super. 2013); *Commonwealth v. Hardy*, 1653 EDA 2012, 2013 WL 11259032 at *2 (Pa. Super. 2013).

[34] *Binderup*, 836 F.3d at 352 n.6.

[35] *Id.* (quoting *Skoien*, 614 F.3d at 642).

[36] *Id.*

[37] 18 Pa.C.S. § 6108.

[38] *See Binderup*, 836 at 348-349, 352 n.4; *see also id.* at 369, 374-376 (Hardiman, J. concurring in part and concurring in the judgments).

[39] *Id.* at 352 n.4.

[40] *Id.* at 374 (Hardiman, J. concurring in part and concurring in the judgments).

[41] *Id.* at 375 (Hardiman, J. concurring in part and concurring in the judgments) (quoting *Binderup v. Holder*, No. 13-6750, 2014 WL 4674424 at *22 (E.D. Pa. Sept. 25, 2014)).

[42] *Id.* at 376 (internal citations omitted) (Hardiman, J. concurring in part and concurring in the judgments).

[43] *Id.* at 375 (Hardiman, J. concurring in part and concurring in the judgments) (quoting *Binderup*, 2014 WL 4674424 at *22).

[44] *Id.* at 352.

[45] *Id.*

[46] *Id.*

[47] *Id.* at 353.

[48] *Id.*

[49] *Id.* at 352-53.

[50] *Id.* at 353 (quoting *Skoien*, 614 F.3d at 642).

[51] *Id.* at 353-54.

[52] *Id.* at 356.

[53] *Id.* at 353 (quoting *Skoien*, 614 F.3d at 642).

[54] ECF Doc. No. 20-1 at 19.

[55] We are mindful of Judge Fuentes' dissent in *Binderup* warning against opening this avenue, "[t]here is a real risk that by instead peering into the seriousness of a [challenger's] prior conviction, we are inviting what are, in effect, collateral attacks on long-closed proceedings." *Binderup*, 836 F.3d at 409 (Fuentes, J. concurring in part, dissenting in part, and dissenting in judgment). Judge Fuentes' dissent is prescient today as we are compelled to address events occurring in a fifteen minute window on November 7, 2005.  As shown the lack of a trial or plea record required our fact-finding to apply the mandated analysis.

[56] *Binderup*, 836 F.3d at 353 (quoting *Skoien*, 614 F.3d at 642).